UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF WISCONSIN

---

WARREN KAQUATOSH, JR.,

    Plaintiff,

    v.                                                       Case No. 19-CV-1204-SCD

ANDREW M. SAUL,
**Commissioner of Social Security,**

    Defendant.

---

## DECISION AND ORDER

---

    Warren Kaquatosh, Jr., applied for Social Security benefits in 2015, alleging that he is unable to work due to various physical and mental impairments. Following a hearing, an administrative law judge (ALJ) denied benefits in 2018, finding that Kaquatosh remained capable of working notwithstanding his impairments. Kaquatosh now seeks judicial review of that decision, arguing that the ALJ's step-five finding is not supported by substantial evidence because neither the residual functional capacity (RFC) nor the hypothetical questions posed to the vocational expert (VE) at the hearing accounted for all his mental-health limitations. The Commissioner contends that the ALJ did not commit an error of law in reaching his decision and that the decision is otherwise supported by substantial evidence. I agree with the Commissioner. Accordingly, his decision will be affirmed.

## BACKGROUND

    Kaquatosh was born on June 5, 1968, in Shawano, Wisconsin. R. 268.[1] He grew up on the Menomonee Indian Reservation, graduating from Menominee Indian High School in

---

[1] The transcript is filed on the docket at ECF No. 13-2 to ECF No. 13-21.

1986. R. 332. After high school, Kaquatosh joined the United States Army, but he fractured his clavicle during a field exercise and was discharged after serving only fifteen months. *See* R. 493, 919. He later attended the College of Menominee Nation in Keshena, Wisconsin, and obtained certificates in welding and building residential buildings. R. 43. From 1998 until 2008, he worked as a logger for Menominee Tribal Enterprises. *See* R. 45, 320. He has also worked as a housekeeper at the Mohican Casino and in various positions at the Menominee Nation sawmill. *See* R. 44–45, 51–54, 320, 332. Kaquatosh was let go from his most recent job on October 24, 2014, after he was hospitalized following a medication-induced fall. *See* R. 52–53, 330.

In August 2015, Kaquatosh applied for disability insurance benefits from the Social Security Administration (SSA), alleging that he became disabled on October 24, 2014 (when he was forty-six years old), his last day of work. R. 197. Kaquatosh asserted that he was unable to work due to shoulder pain and lower back problems. R. 330. After his application was initially denied at the local level, *see* R. 69–78, the Wisconsin Disability Determination Bureau referred Kaquatosh for a mental-status evaluation, as his medical records mentioned mental-health symptoms following the death of his wife during the summer of 2014 but contained no mental-status examinations. *See* R. 49–50, 84–85. Sandra L. King, PhD, examined Kaquatosh on October 4, 2016, and filed a written report documenting the mental-status evaluation. *See* R. 919–22. A few weeks later, Kaquatosh's application was denied at the reconsideration level based, in part, on the evaluation of state-agency psychological consultant JoAnne Coyle, PhD. *See* R. 79–97. Thereafter, Kaquatosh requested an administrative hearing before an ALJ. *See* R. 191–94.

Kaquatosh, along with his attorney, appeared before ALJ Patrick Berigan on July 9, 2018. R. 34–68. At the time of the hearing, Kaquatosh was fifty years old. He was living in a mobile home in Neopit, Wisconsin, with his two daughters, ages thirteen and eleven, and his dog. R. 42. Kaquatosh testified that he was unable to work due to pain in his lower back, shoulders, legs, and hips R. 46–49, 51–55. He also reported having mental-health symptoms, though he was not taking medication or receiving psychological treatment at that time. R. 49–50.

The ALJ also heard testimony from Jacqueline Wenkman, a vocational expert. According to Wenkman, Kaquatosh's housekeeper job was light on the SSA's exertional scale, while she classified the logger job as heavy. R. 57. Wenkman testified that a hypothetical person with Kaquatosh's age, education, and work experience could still perform the housekeeper job, but not the logger one, if he were restricted to light work involving (among other nonexertional limitations) "simple, routine tasks performed in a work environment free of fast-paced production requirements involving only simple work-related decisions, and with few, if any, workplace changes." R. 58–59. That person could also perform other jobs, including, for example, a cashier, a host, and an office helper. R. 59.

Applying the standard five-step process, *see* 20 C.F.R. § 404.1520(a)(4) on November 6, 2018, the ALJ issued a decision concluding that Kaquatosh was not disabled. *See* R. 17–33. The ALJ determined that Kaquatosh had not engaged in substantial gainful activity since October 24, 2014, his alleged onset date. R. 22. The ALJ found that Kaquatosh's physical and mental impairments limited his ability to work, but none (alone or in combination) met or equaled the severity of a presumptively disabling impairment. R. 23–24. Specifically, with respect to mental impairments, the ALJ determined that Kaquatosh had a moderate

limitation in understanding, remembering, or applying information; a mild limitation in interacting with others; a moderate limitation with regard to concentrating, persisting, or maintaining pace; and a mild limitation in adapting or managing himself. *Id.*

The ALJ next determined that Kaquatosh had the RFC to perform light work, but, in light of his cognitive limitations, he would be "limited to simple, routine tasks performed in an environment free from fast paced production requirements; involving only simple work-related decisions; and few, if any, workplace changes." R. 24–25. In assessing Kaquatosh's RFC, the ALJ gave "significant weight" to the opinions of Dr. King, the consultative psychological examiner, and Dr. Coyle, the state-agency psychological consultant. *See* R. 28–29, 31. The ALJ determined that, in light of the above RFC, Kaquatosh could perform his past job as a housekeeper, as well as a cashier, a host, and an office helper; therefore, he was not disabled. R. 31–33.

After the SSA's Appeals Council denied review, *see* R. 1–7, making the ALJ's decision the final decision of the Commissioner of Social Security, *see Loveless v. Colvin*, 810 F.3d 502, 506 (7th Cir. 2016), Kaquatosh filed this action on August 20, 2019. ECF No. 1. The matter was reassigned to this court in April 2020 after all parties consented to magistrate-judge jurisdiction under 28 U.S.C. § 636(c) and Fed. R. Civ. P. 73(b). *See* ECF Nos. 20, 21. The matter is fully briefed and ready for disposition. *See* ECF Nos. 14, 17, 19.

**APPLICABLE LEGAL STANDARDS**

"Judicial review of Administration decisions under the Social Security Act is governed by 42 U.S.C. § 405(g)." *Allord v. Astrue*, 631 F.3d 411, 415 (7th Cir. 2011) (citing *Jones v. Astrue*, 623 F.3d 1155, 1160 (7th Cir. 2010)). Pursuant to sentence four of § 405(g), federal courts have

4

the power to affirm, reverse, or modify the Commissioner's decision, with or without remanding the matter for a rehearing.

Section 205(g) of the Act limits the scope of judicial review of the Commissioner's final decision. *See* § 405(g). As such, the Commissioner's findings of fact shall be conclusive if they are supported by "substantial evidence." *See* § 405(g). Substantial evidence is "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Moore v. Colvin*, 743 F.3d 1118, 1120–21 (7th Cir. 2014) (quoting *Richardson v. Perales*, 402 U.S. 389, 401 (1971)) (other citations omitted). The ALJ's decision must be affirmed if it is supported by substantial evidence, "even if an alternative position is also supported by substantial evidence." *Scheck v. Barnhart*, 357 F.3d 697, 699 (7th Cir. 2004) (citing *Arkansas v. Oklahoma*, 503 U.S. 91, 113 (1992)).

Conversely, the ALJ's decision must be reversed "[i]f the evidence does not support the conclusion," *Beardsley v. Colvin*, 758 F.3d 834, 837 (7th Cir. 2014) (citing *Blakes v. Barnhart*, 331 F.3d 565, 569 (7th Cir. 2003)), and reviewing courts must remand "[a] decision that lacks adequate discussion of the issues," *Moore*, 743 F.3d at 1121 (citations omitted). Reversal also is warranted "if the ALJ committed an error of law or if the ALJ based the decision on serious factual mistakes or omissions," regardless of whether the decision is otherwise supported by substantial evidence. *Beardsley*, 758 F.3d at 837 (citations omitted). An ALJ commits an error of law if his decision "fails to comply with the Commissioner's regulations and rulings." *Brown v. Barnhart*, 298 F. Supp. 2d 773, 779 (E.D. Wis. 2004) (citing *Prince v. Sullivan*, 933 F.2d 598, 602 (7th Cir. 1991)). Reversal is not required, however, if the error is harmless. *See, e.g.*, *Farrell v. Astrue*, 692 F.3d 767, 773 (7th Cir. 2012); *see also Keys v. Barnhart*, 347 F.3d 990, 994–95 (7th Cir. 2003) (citations omitted).

5

In reviewing the record, this court "may not re-weigh the evidence or substitute its judgment for that of the ALJ." *Skarbek v. Barnhart*, 390 F.3d 500, 503 (7th Cir. 2004) (citing *Lopez ex rel. Lopez v. Barnhart*, 336 F.3d 535, 539 (7th Cir. 2003)). Rather, reviewing courts must determine whether the ALJ built an "accurate and logical bridge between the evidence and the result to afford the claimant meaningful judicial review of the administrative findings." *Beardsley*, 758 F.3d at 837 (citing *Blakes*, 331 F.3d at 569; *Zurawski v. Halter*, 245 F.3d 881, 887 (7th Cir. 2001)). Judicial review is limited to the rationales offered by the ALJ. *See Steele v. Barnhart*, 290 F.3d 936, 941 (7th Cir. 2002) (citing *SEC v. Chenery Corp.*, 318 U.S. 80, 93–95 (1943); *Johnson v. Apfel*, 189 F.3d 561, 564 (7th Cir. 1999); *Sarchet v. Chater*, 78 F.3d 305, 307 (7th Cir. 1996)).

## ANALYSIS

Kaquatosh argues that the ALJ's RFC assessment and the hypothetical questions posed to the VE did not account for all his mental-health limitations. Specifically, he contends the ALJ erred by not adequately addressing certain limitations opined by Dr. King and Dr. Coyle, despite assigning significant weight to those opinions. Kaquatosh further contends the ALJ did not sufficiently account for his moderate limitation in concentrating, persisting, or maintaining pace.

**I.     Dr. King**

Dr. King examined Kaquatosh on October 4, 2016. The mental-status portion of the exam revealed an irritable mood and affect, sleep disturbance, low energy, a sense of worthlessness, mild social withdrawal, impaired immediate memory, weak fund of knowledge, slightly impaired abstract thinking, and mildly inadequate insight and judgment. R. 920–21. Kaquatosh's functioning, including his general appearance, attitude and behavior,

6

thought content, stream of mental activity, remote memory, recent memory, and concentration, was otherwise normal. *Id.* Dr. King diagnosed attention-deficit/hyperactivity disorder (predominantly inattention presentation), persistent depressive disorder (dysthymia), and unspecified alcohol-related disorder and issued the following "Statement of Work Capacity":

> Mr. Kaquatosh is able to understand directions[] but may have moderate difficulties remembering and carrying out instructions. He is predicted to have mild difficulties in responding appropriately to supervisors and co-workers due to irritability. His ability to maintain concentration and attention appears to be moderately impaired. He is expected to have moderate to severe difficulties withstanding routine work stress and adapting to change. Should he be awarded disability benefits, he would not need the assistance of a payee, as he is able to manage his own funds.

R. 921–22. The ALJ purportedly gave significant weight to Dr. King's opinion. *See* R. 29.

Kaquatosh argues that the ALJ failed to address two of Dr. King's specific opinions: (1) that Kaquatosh's ability to maintain concentration and attention appeared to be moderately limited; and (2) that Kaquatosh would likely have moderate to severe difficulties withstanding routine work stress. *See* ECF No. 14 at 17–23; ECF No. 19 at 6–10. I disagree on both issues. First, the ALJ explicitly declined to adopt Dr. King's opinion with respect to Kaquatosh's ability to maintain concentration and attention, finding it "vague and internally inconsistent." R. 29. This finding is supported by the record. Dr. King's conclusion that the "mental status exam results were remarkable for . . . moderate impairment in concentration" is belied by her own notes for that portion of the exam, which indicate that Kaquatosh "was able to do serial three subtractions from 100 without error," "correctly spelled the word WORLD, both forward and backward," "was able to follow a three-step command," and "was able to follow conversation." R. 921. Because Dr. King did not document any impairment in concentration during the mental-status exam, the ALJ reasonably determined that her

7

opinion concerning that functional domain was inconsistent with and unsupported by her own clinical findings.

Second, the ALJ's RFC sufficiently accounted for Kaquatosh's stress-related limitations. The ALJ limited Kaquatosh to "to simple, routine tasks performed in an environment free from fast paced production requirements; involving only simple work-related decisions; and few, if any, workplace changes." R. 25. Kaquatosh fails to explain why these limitations were inadequate. Indeed, he admits that, collectively, these specific limitations confined him to low-stress jobs. *See* ECF No. 14 at 23 ("In addressing the residual functional capacity and the hypothetical question, the ALJ found that Kaquatosh was limited to low stress jobs, defined as those with only occasional decision-making or changes in the work setting required."). The ALJ therefore reasonably accounted for the portions of Dr. King's opinion that were supported by the record.

## II. Dr. Coyle

Dr. Coyle evaluated Kaquatosh's mental impairments for the state agency at the reconsideration level. In the Psychiatric Review Technique portion of the form, Dr. Coyle concluded that Kaquatosh had a "mild" restriction of activities of daily living; "moderate" difficulties in maintaining social functioning; "moderate" difficulties in maintaining concentration, persistence, or pace; and no repeated episodes of decompensation, each of extended duration. R. 87. Based on these findings, none of Kaquatosh's mental impairments was presumptively disabling. Dr. Coyle also completed a Mental Residual Functional Capacity Assessment form. In that section, she determined that Kaquatosh was "moderately limited" in the following functional areas:

- The ability to understand and remember simple and multi-step instructions

8

- The ability to carry out detailed instructions

- The ability to maintain attention and concentration for extended periods

- The ability to perform activities within a schedule, maintain regular attendance, and be punctual within customary tolerances

- The ability to complete a normal workday and workweek without interruptions from psychologically based symptoms and to perform at a consistent pace without an unreasonable number and length or rest periods

- The ability to interact appropriately with general public

- The ability to accept instructions and respond appropriately to criticism from supervisors

- The ability to get along with coworkers or peers without distracting them or exhibiting behavioral extremes

- The ability to respond appropriately to changes in the work setting

R. 91–93. Dr. Coyle went on to explain that Kaquatosh can understand and remember simple and multi-step instructions; can sustain attention and concentration for simple and multi-step tasks; can maintain effort for two-hour periods over the course of an eight-hour workday and standard workweek in a setting permissive of some degree of self pacing; is capable of superficial interactions with the general public; can participate in typical interactions with coworkers and supervisors while completing simple and multistep tasks; is able to maintain adequate personal grooming and hygiene; is able to adapt to minor changes in routine; is capable of independent goal-directed behavior; is aware of typical hazards; and can travel independently. R. 92–93. The ALJ purportedly gave significant weight to Dr. Coyle's opinion, finding it supported by the evidence of depression, ADHD, and substance abuse. R. 31 (citing Exhibits 12F [R. 919–22]; and 15F/2–3 [R. 1080–81]).

Kaquatosh argues that the ALJ's RFC failed to incorporate Dr. Coyle's limitations regarding public contact, work pace, and goal-directed behavior. *See* ECF No. 14 at 13–17; ECF No. 19 at 5–6, 10–11. In his view, "[t]he last two limitations specifically indicate Kaquatosh could control his work pace and achieve end of the day workweek goals, e.g., piece-work or worker-controlled pace." ECF No. 14 at 14. According to Kaquatosh, these limitations translate "to jobs which would be numerically performed, e.g., with performance targets or goals; or by self-paced work which allows the employee to determine the timing of tasks." *Id.* at 15. As to the first omitted limitation, public contact, Kaquatosh believes restricting him from "work around the public . . . would tend to preclude office work, some warehouse work, and factory work." *Id.* at 16. He maintains that the ALJ's failure to include these three limitations in the hypotheticals posed to the VE undermined the reliability of the VE's job-number estimates and, therefore, did not satisfy the Commissioner's step-five burden. *Id.* at 15–16.

Kaquatosh has not demonstrated that the ALJ committed reversible error with respect to his incorporation of Dr. Coyle's opined limitations. The limitations concerning self-pacing and goal-directed behavior do not sweep as broadly as Kaquatosh suggests. Dr. Coyle did not indicate that Kaquatosh was capable of only self-paced work; rather, she thought that, to maintain concentration throughout the workday and workweek, Kaquatosh needed a job that involved *some degree* of self-pacing. Similarly, Dr. Coyle's opinion that Kaquatosh was capable of independent, goal-directed behavior does not mean that he was capable of only jobs that had numeric performance targets. In any event, the ALJ does appear to have accounted for Kaquatosh's moderate adaptation limitation by restricting him to jobs that involved few, if any, workplace changes. As to Dr. Coyle's social restrictions, it's true that the ALJ did not

10

include a public-contact limitation in the RFC. But this was not fatal. At step three, the ALJ determined that Kaquatosh had only a mild limitation in interacting with others based on his own statements that he spent time with other people and didn't have problems getting along with others. R. 24 (citing Exhibits 5E [R. 338–46]; 8E [R. 355–62]). The ALJ therefore reasonably did not adopt Dr. Coyle's limitation concerning interactions with the public.

Even if the ALJ did err in failing to incorporate Dr. Coyle's limitations regarding public contact, work pace, and goal-directed behavior, any error appears was harmless. Kaquatosh contends that this alleged mistake resulted in a deficient step-five finding. But the ALJ's finding that Kaquatosh was capable of performing other work was secondary to his determination at step four that Kaquatosh could still perform his past job as a housekeeper. The ALJ's step-four finding is sufficient to support a denial of benefits and is unchallenged here. Moreover, I am not convinced that including all of Dr. Coyle's limitations would have materially affected the ALJ's findings at steps four and five. It appears that Kaquatosh's housekeeper job and the office helper job mentioned by the VE both would involve at most superficial interactions with the general public, some degree of self-pacing, and working independently toward a goal. Of course, expert testimony would likely be needed to make a definitive ruling on this issue.

### III. Concentration, persistence, or pace

At step three, the ALJ determined that Kaquatosh's mental impairments (depression and ADHD) caused a moderate limitation in his ability to concentrate, persist, or maintain pace. R. 23–24. His RFC—the same one presented to the VE at the administrative hearing, R. 58—limited Kaquatosh to "simple, routine tasks performed in an environment free from fast paced production requirements; involving only simple work-related decisions; and few, if

11

any, workplace changes," R. 25. Given this RFC, as well as the VE's hearing testimony, the ALJ determined that Kaquatosh could perform his past job as a housekeeper (step four); alternatively, the ALJ determined that Kaquatosh could work as a cashier, a host, and an office helper (step five). R. 31–33.

Kaquatosh argues that the mental-health limitations posed to the VE and included in the ALJ's ultimate RFC "do not adequately encapsulate moderate limitations in concentration, persistence or pace." ECF No. 14 at 24–29; ECF No. 19 at 11–15. In support, he cites a number of cases from within the Seventh Circuit—at both the circuit-court and district-court level—where similar limitations were deemed inadequate. Because "the hypothetical question was flawed," the argument goes, the VE's testimony "could not be used to satisfy the Commissioner's burden of proof at step five." ECF No. 14 at 29.

The Seventh Circuit has made clear that, "both the hypothetical posed to the VE and the ALJ's RFC assessment must incorporate all of the claimant's limitations supported by the medical record,' including even moderate limitations in concentration, persistence, or pace." *Crump v. Saul*, 932 F.3d 567, 570 (7th Cir. 2019) (quoting *Varga v. Colvin*, 794 F.3d 809, 813 (7th Cir. 2015)). Although no "magic words" are required, "[o]ften, 'employing terms like "simple, repetitive tasks"' on their own will not necessarily exclude from the VE's consideration those positions that present significant problems of concentration, persistence, and pace.'" *Kuykendoll v. Saul*, 801 F. App'x 433, 438 (7th Cir. 2020) (quoting *O'Connor-Spinner v. Astrue*, 627 F.3d 614, 620 (7th Cir. 2010)). Nevertheless, a hypothetical that omits the terms "concentration, persistence, and pace" is sufficient "when it [is] manifest that the ALJ's alternative phrasing specifically excluded those tasks that someone with the claimant's

12

limitations would be unable to perform.'" *Kuykendoll*, 801 F. App'x at 438 (quoting *O-Conner-Spinner*, 627 F.3d at 619).

The ALJ did not commit reversible error with respect to Kaquatosh's moderate limitations in concentration, persistence, and pace. *First*, as with Dr. Coyle's limitations, Kaquatosh makes no attempt to challenge the ALJ's finding at step four. *Second*, unlike the cases he cites, the hypothetical and RFC here adequately accounted for Kaquatosh's limitations. Kaquatosh did not seek disability benefits based on any mental impairments, he has received minimal mental-health treatment, his mental-status exams have been relatively normal, and he testified at the hearing that his mental-health issues did not impact his ability to work, R. 50. He was first diagnosed with ADHD—the main issue that causes his limitations with concentration, persistence, or pace—by Dr. King, despite exhibiting normal concentration and attention during the consultative evaluation. Although Dr. Coyle noted that Kaquatosh was moderately limited in a few specific areas involving concentration and persistence, he translated these findings into a specific RFC, opining that Kaquatosh was able to sustain attention and concentration for simple and multi-step tasks and could maintain effort throughout the workday and workweek as long as he was in a setting permissive of some degree of self-pacing. These limitations were given to the VE and included in the ultimate RFC. *See Burmester v. Berryhill*, 920 F.3d 507, 511 (7th Cir. 2019) ("The ALJ appropriately relied on the narrative statement in crafting the hypothetical to the vocation expert and the RFC."). *Finally*, Kaquatosh has not identified any relevant limitations in concentration, persistence, or pace that the ALJ omitted and should have included in the hypothetical question and RFC. *See Jozefyk v. Berryhill*, 923 F.3d 492, 498 (7th Cir. 2019)

13

(ruling any error in RFC harmless in part because plaintiff hypothesized no additional restrictions).

## CONCLUSION

For all the foregoing reasons, I find that the ALJ did not commit reversible error with respect to Kaquatosh's mental-health limitations. Thus, the Commissioner's decision is **AFFIRMED**. The clerk of court shall enter judgment accordingly.

**SO ORDERED** this 23rd day of July, 2020.

_____
STEPHEN C. DRIES
United States Magistrate Judge